**Arnulfo DIAZ, et al.; David Jose Vasquez, et al., Plaintiffs,**

v.

**SAN JOSE UNIFIED SCHOOL DISTRICT, et al., Defendants.**

**No. C–71–2130 RFP (SJ).**

United States District Court, N.D. California.

Dec. 31, 1985.

Order Re Faculty Desegregation March 21, 1986.

Cynthia L. Rice, Stephen Kociol, Gilbert P. Carrasco, San Jose, Cal., Norma V. Cantu, Antonio Hernandez, San Antonio, Tex., for plaintiffs.

Celia Ruiz, Breon, Galgani, Godino & O'Donnell, San Francisco, Cal., Peter D. Collisson, Crowe, Collisson & Kaplan, Newport Beach, Cal., Robert C. Post, Berkeley, Cal., for defendants.

## MEMORANDUM AND ORDER RE DESEGREGATION REMEDY

PECKHAM, Chief Judge.

This case proceeds upon a finding by the Ninth Circuit Court of Appeals that the San Jose Unified School District ("District") engaged in *de jure* segregation of its schools in violation of the Fourteenth Amendment. *Diaz v. San Jose Unified School District*, 733 F.2d 660 (9th Cir.

1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 2140, 85 L.Ed.2d 497 (1985). This order addresses the measures that the Board of Education of the District must adopt to remedy this constitutional violation.

## BACKGROUND

### A. *The Nature of the District*

The San Jose Unified School District is situated in Santa Clara County. Its shape is long and narrow, with a length of approximately 16 miles from north to south and a width varying from one and one-half miles to four miles east to west. The Spanish-surnamed minority population is concentrated in the downtown area in the northern part of the district. The Anglo residents, on the other hand, are primarily in the southern part of the district, which is suburban.

The number of public school students in grades K–12 totaled 30,565 in October 1984. The minority student population, according to the October 1984 District Ethnic Recap, was 43.0%. The largest minority group is Hispanic (30.9% of students), followed by Asian (8.4%), and Black (2.4%). The Anglo population was 57.0% in October 1984. *See* Exhibit J–1, Data Overview. The District projects that by 1990, the majority student population will decline to 46.8%. Exhibit J–1, 1984–85 Data, "Population Projections."

The district currently has 37 public schools: twenty-three of these are elementary level, grades K–5; seven are middle schools, grades 6–8; and seven of the schools are high schools, grades 9–12. Five of the district's schools are magnet schools that serve to attract students from outside neighborhood attendance areas for purposes of desegregation.

### B. *History of the Case*

This action began in 1971 when plaintiffs filed a class action on behalf of all Spanish-surnamed students enrolled in the district and their parents. The complaint alleged that defendants were operating an unconstitutionally segregated public school system and sought injunctive relief to effect desegregation.

After a trial in July and August of 1974, this court found that, although the district was racially imbalanced and defendants had created or maintained this imbalance, the defendants had acted without segregative intent and had consistently adhered to a neighborhood school policy. *Diaz v. San Jose Unified School District,* 412 F.Supp. 310, 334 (N.D.Cal.1976). On appeal, this decision was vacated and remanded by the Ninth Circuit for reconsideration following the Circuit's finding that "[a]n inference of segregative intent arose from the appellants' proof." *Diaz v. San Jose Unified School District,* 612 F.2d 411, 415 (9th Cir.1979).

On remand, this court again found the evidence insufficient to support a finding of segregative intent, holding that the District's neighborhood school policy was not a means of maintaining segregated schools in an unlawful manner. *Diaz v. San Jose Unified School District,* 518 F.Supp. 622, 644 (N.D.Cal.1981). Nevertheless, the court counseled the District Board against "[c]ontinued failure to choose the path which leads towards less ethnic imbalance in the schools." *Id.* at 644.

On the plaintiffs' second appeal, the Ninth Circuit initially affirmed; after a rehearing en banc, the Circuit found that the District had acted with segregative intent in maintaining imbalanced schools. *Diaz,* 733 F.2d 660. The court reached this conclusion after considering the District's failure to comply with state guidelines on desegregation, its statements in connection with a vote on a bond issue, its policy with respect to siting new schools, its assignment of faculty and staff, and its busing of students for purposes other than integration.

### C. *Remedial Proceedings*

In July 1985, the District sought to have this court approve a voluntary magnet program. Plaintiffs argued that defendants' plan only partially addressed the Ninth Circuit's mandate to desegregate the District,

and might prove counterproductive in future desegregation efforts. This court rejected the District's proposal in an order filed August 27, 1985, and directed the District to file a comprehensive desegregation plan.

On September 30, 1985, the District submitted a proposed desegregation plan. Plaintiffs responded on November 15, 1985, to the District's plan and offered an alternative desegregation proposal of their own. The District then filed a reply brief defending and modifying its plan and criticizing the plaintiffs' alternative plan. The court also received five amicus briefs. On December 11, 1985, this court commenced a ten-day hearing in San Jose for the purpose of gathering evidence from both the District and plaintiffs regarding an appropriate remedy to desegregate the District's schools.

## D. An Overview of the Parties' Proposals

The District's original desegregation plan, Exhibit D–5, submitted September 30, 1985, was based largely upon a voluntary approach to student reassignment. The District suggested a definition of a desegregated school as being one that was within ± 20% of the district-wide proportion of majority students. The District's goal was to have 75% of the students within desegregated schools by the 1990–91 school year.

The District proposed to establish four district-wide "dedicated" magnet schools and sixteen magnet "programs" to attract students from segregated neighborhood attendance area schools. Most of these magnet schools would be located in the northern part of the district in order to draw majority students from the south to schools which have a much greater minority population than the district-wide average.

The District's plan established two additional means of relocating students. First, three minority-dominant schools in the north, San Jose High School, Burnett Middle School, and Gardner Elementary, were to have been closed or converted to mag-

nets. The attendance areas of the students in these schools would have then been changed to relocate these students to schools where they would have a desegregative impact. The District's plan also contemplated the use of "majority to minority" ("M to M") transfers whereby a student would be able to transfer from a school in which his or her ethnicity is in the majority to any school in which his or her ethnicity is in the minority.

It is important to note that the District's plan underwent significant modification from the time of its original submission to the time of the conclusion of the court's evidentiary hearing on December 24, 1985. The two most important changes were (1) the decision not to close San Jose High School, but rather, convert it into a dedicated magnet school for grades 6–12, and (2) the establishment of specific interim desegregation goals and the specification, albeit somewhat loosely, of a mandatory backup provision in the event that voluntary reassignments via magnets and M to M transfers were not sufficient to desegregate the district's schools. This mandatory provision consists of enrollment caps that would be placed on specific schools to limit the enrollment of new students who could cause the ethnic balance of the school to be outside the necessary range for a desegregated enrollment.

The plaintiffs' plan, Exhibit P–23, submitted November 15, 1985, differed significantly from that of the defendants. Although the plaintiffs also emphasized the role of voluntary student reassignments from racially isolated to desegregated schools, their plan involved a mandatory element of much greater magnitude than that proposed by the District. The plaintiffs proposed to eliminate the existing neighborhood attendance areas and to divide the district into three vertical attendance zones, each of which would not differ from the district-wide ethnic composition of the district by more than plus or minus one-third of the system-wide proportion of majority students. Unless students within each zone chose to attend a city-wide mag-

net school (one for elementary, one for middle, and three for high school), they would have to choose an elementary, middle, or high school contained in their attendance zone. Each zone would contain seven or eight elementary schools, two middle schools, and one high school.

Through a process labeled "controlled choice," the students in each attendance zone would be placed in each of the schools in a manner so as to closely reflect the zone-wide racial percentages. The ethnic composition of each school would differ by no more than 5% from the zone-wide minority or majority composition for schools at that level. Each student would rank his or her first, second, and third choices for a district-wide magnet or a school within the attendance zone. If a school became over-subscribed in terms of space available for either majority or minority students, then a lottery would be held to determine which students received their designated school.

Those students who could not be placed in the schools they selected would be mandatorily assigned to a school in their zone where their enrollment would have a positive effect in terms of desegregation. The plaintiffs' plan would result in 100% of the students being placed in desegregated schools in the first year of the implementation of their plan.

## LEGAL REQUIREMENTS

### A. *The Equitable Nature of the Remedy*

■ The Ninth Circuit's finding that the San Jose Unified School District operated an unconstitutionally segregated school system charges the District with the affirmative duty to take whatever steps might be necessary to convert to a "unitary" system in which racial discrimination is eliminated. *Green v. County School Board*, 391 U.S. 430, 437–38, 88 S.Ct. 1689, 1693–94, 20 L.Ed.2d 716 (1968). The role of the district court upon a finding of *de jure* segregation is to fashion a remedy that assures that the school district successfully makes this transition to a unitary system. This remedial enterprise is wholly equitable in nature. *Brown v. Board of Education*

(Brown II), 349 U.S. 294, 299–300, 75 S.Ct. 753, 755–56, 99 L.Ed. 1083 (1955); *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971) ("Once a right and a violation have been shown, the scope of the district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.").

■ The court must look to three factors in exercising this equitable power. First, the scope of the desegregation remedy is to be determined by the nature of the constitutional violation. *Id.* 402 U.S. at 16, 91 S.Ct. at 1276. Second, the court's decree must be remedial, and thus designed to restore the victims of discrimination to the position they would have occupied in the absence of unconstitutional conduct by the District. *Milliken v. Bradley* (Milliken II), 433 U.S. 267, 280–81, 97 S.Ct. 2749, 2757–58, 53 L.Ed.2d 745 (1977). Third, the remedy should take account of the interests of local authorities in managing their own affairs, so long as this local action is consistent with the Constitution. *Id.*

This third element, deference to local interests in school administration, suggests that the court's remedy must, to some extent, factor in interests other than those of the plaintiffs whose constitutional rights have been abridged. As the Supreme Court noted in *Swann*,

> ... a school desegregation case does not differ fundamentally from other cases involving the framing of equitable remedies to repair the denial of a constitutional right. The task is to correct, by a balancing of the individual and collective interests, the condition that offends the Constitution.

402 U.S. at 15–16, 91 S.Ct. at 1275–76.

The success of a remedial plan is measured by its effectiveness. *Davis v. Board of School Commissioners*, 402 U.S. 33, 37, 91 S.Ct. 1289, 1291, 28 L.Ed.2d 577 (1971). An effective plan, however, need not be inconsistent with one that balances various interests affected by the plan. The task of constructing this type of effective eq-

uitable remedy dictates that the court must take into account the "practicalities of the situation." *Id.*

B. *The District's Role in Fashioning a Remedy*

■ The burden of proposing an effective desegregation plan properly falls upon the defendant school district following a finding of unlawful segregation. *Mendoza v. United States,* 623 F.2d 1338, 1345 (9th Cir.1980), *cert. denied,* 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981) ("In the first instance, ... the Court must give the local school officials an opportunity to devise changes sufficient to bring the schools' operations within the constitutional standards."). As the Supreme Court indicates in both *Green* and *Swann,* however, this opportunity of the defendants to come forward with an effective plan by no means assures its adoption by the court as an appropriate remedy. *Green,* 391 U.S. at 439, 88 S.Ct. at 1694; *Swann,* 402 U.S. at 17, 91 S.Ct. at 1276. "In default by the school authorities of their obligation to proffer acceptable remedies, a district court has broad power to fashion a remedy that will assure a unitary school system." *Id.*

In this case, the court has adopted the basic desegregation strategy put forward by the District. Nevertheless, the District's plan has been altered in several important respects in light of the District's partial failure to come forward with an appropriate remedy. The court considers such changes necessary to ensure that the

remedy is both fair and effective, and, accordingly, orders the remedy set forth below.

## THE REMEDY

A. *Overview*

■ The desegregation of the San Jose School District will be accomplished over the next four to five years by a plan that relies heavily on the use of magnet schools and specialty enrichment[1] programs to encourage voluntary transfers for the purpose of desegregation. The District will retain or establish at least five schools as district-wide dedicated magnets. These schools, which will be open to students from all attendance areas, will include San Jose High School, Peter Burnett Middle School, Gardner Elementary School, Horace Mann Elementary School, and Hacienda-Valley View Elementary School.

In sixteen other schools, the District will either retain or establish specialty enrichment programs. These schools[2] will remain attendance area schools, but will accept students from other attendance areas who contribute to the desegregation of the host school. Although the District has indicated the specific types of magnets and specialty enrichment programs that it plans to offer, this order does not restrict the District's ability to add to these offerings or relocate such programs in order to better serve the needs of students in the District and/or enhance the desegregative impact of this plan.[3]

---

1. These programs are described as magnet programs in the District's plan. This court changes this designation only in the interest of avoiding semantic confusion. It does not suggest by making this change that such programs are not magnet programs for purposes of obtaining government funding.

2. The District has indicated that it will establish or continue specialty enrichment (magnet) programs at the following elementary schools: Bachrodt, Cory, Empire Gardens, Grant, Graystone, Hester, Lowell, Olinder, Randol, Trace, and Washington. At the secondary level, three middle schools, Castillero, Bret Harte and Hoover, and two high schools, Leland and Lincoln, will also have specialty enrichment programs.

3. Plaintiffs have complained that the District did not ask for enough community input when it determined the type and location of each magnet school or specialty enrichment program. The District indicates that it sought community input at meetings in all geographic areas (Tr. 2–36 to 2–37). Nevertheless, the evidence indicates that the last attempt at a comprehensive market survey was made in 1981, and that the return rate for that survey was low. *See* Exhibit J–19. The District may, therefore, need to do a more extensive survey of the desires of parents and needs of students.

In light of the court's determination that Burnett School will be retained as a middle school, the District may find that the addition of or

In schools that will not be dedicated magnets or offer specialty enrichment programs, the District will identify or develop "programs of excellence" to attract students from other attendance areas. A student who does not reside in the attendance area of such a school may transfer to that school if such transfer will improve the racial balance at both the sending and receiving schools. The District may place specialty enrichment programs in such schools, should it so desire.

Enrollment in all schools will be accomplished by a student assignment process, described in more detail below. As a part of this process, parents will rank their choices of schools for their children. The District will try to enroll all students in a school that has been ranked as a choice. The District will honor first choices to the extent that they are consistent with desegregation goals and school capacities. The District will provide transportation for all elementary students enrolled in schools more than 1.5 miles from their homes, and all secondary students enrolled in middle or high schools more than 2.5 miles from their homes. The District will also continue its policy to provide transportation for students living within shorter distances from their schools, where walking would be hazardous. *See* Exhibit D–5 at 26, 28.

If the District exhausts the potential for voluntary transfers without meeting desegregation goals, it will place ethnic enrollment caps (discussed below) on segregated schools until they become desegregated. If necessary, that process will require that the District redirect some students and assign them to schools their parents did not

choose. The District has represented that its voluntary program will be sufficiently successful to obviate the need for significant use of such measures (Tr. 4–89).

### B. *A Unitary System*

In order to remedy its violation of plaintiffs' constitutional rights, the District must now desegregate its schools and "take whatever steps might be necessary to convert to a unitary system in which racial discrimination [is] eliminated." *Green*, 391 U.S. at 437–38, 88 S.Ct. at 1693–94.

### 1. *Definition of a Desegregated School*

This court defines a desegregated school as a school with at least 20% majority and at least 20% minority students, that is also either: (1) a district-wide school with a majority enrollment within ± 5% of the district-wide proportion of majority students at that school level (K–5, 6–8, or 9–12);[4] or (2) an attendance-area school with a majority enrollment within ± 20% of the district-wide proportion of majority students at that school level. The court adopted this definition after consideration of the proposals of both parties, and examination of the definitions used in other desegregation cases.

The District did not dispute testimony by plaintiffs' expert, Dr. Charles Willie, that an ethnic group would risk continued isolation if it did not represent at least 20% (a "critical mass") of the student body at a given school (Tr. 8–75 to 8–76). It, therefore, agreed that a floor of 20% was reasonable for the appropriate representation of either majority or minority students at a

---

shift to a high tech emphasis is appropriate at that site. The court does not limit the District to the programs it proposed as part of its plan. *See* Exhibit D–5 at 24–25, 40–42.

4. To reduce the initial burden on minority students, and to offset some of the logistical problems the District anticipates in converting currently segregated schools into district-wide magnets, the court will allow some deviation from this definition for the first two years of a district-wide school's operation. In the first year that a district-wide school is operated, it will be considered a desegregated school if its majority

enrollment is within ± 15% of the district-wide proportion of majority students at that school level. During its second year of operation, a district-wide school will be considered a desegregated school if its majority enrollment is within ± 10% of the district-wide proportion of majority students at that school level. Beginning with its third year of operation and thereafter, a district-wide school will be considered desegregated only if its majority enrollment is within ± 5% of the district-wide proportion of majority students at that grade level.

desegregated school (Tr. 10–153). The definition of a desegregated school is phrased in terms of the percent by which enrollment may deviate from the district-wide proportion of majority or minority students at each school level to allow the definition to self-adjust as the overall proportion of minority students increases or decreases.

Under the District's proposal, district-wide schools would have a 50% majority and 50% minority student enrollment (Tr. 10–22). Dr. Willie pointed out, however, that a rigid 50/50 policy would be inequitable to the extent that it did not reflect ethnic ratios within the district. As the District becomes predominantly minority, the 50/50 ratio would reserve a disproportionate share of seats in the best schools for majority students (Tr. 10–71 to 10–72). The court, therefore, adopts a more flexible definition (± 5%) that will self-adjust as the racial composition of the district changes.

The parties also disagree about the percent by which school enrollments should be allowed to deviate from district-wide racial proportions. Plaintiffs assert that a 20% deviation would be unconstitutional (Tr. 10–183), and suggest that an appropriate deviation would be ± 10% (Tr. 10–190). The District asserts that ± 20% is comparable to ranges accepted in other cases (Tr. 10–154).

Courts have used a wide range of percentage bands in defining the appropriate enrollment levels at desegregated schools. In Milwaukee, the original court order defined a desegregated school as one that was 25–45% black. See Armstrong v. O'Connell, 416 F.Supp. 1344, 1346 (E.D. Wis.1976). But a subsequent settlement agreement, redefining a desegregated elementary school as one that was 25–60% black, and a desegregated high school as one that was 20–60% black, was upheld on appeal. See Armstrong v. Board of School Directors of Milwaukee, 471 F.Supp. 800, 807 (E.D.Wis.1979), aff'd, 616 F.2d 305 (7th Cir.1980). In Buffalo, a desegregated school was originally defined as one that was 25–65% minority. That definition was later revised to include only schools that are 30–65% minority. See Arthur v. Nyquist, 566 F.Supp. 511, 514 (W.D.N.Y.1983). And, in Prince George's County, a desegregated school was originally defined as one that was 10–50% black. See Vaughns v. Board of Education of Prince George's County, 355 F.Supp. 1051, 1054 (D.Md.1972). In a later order, the upper limit was revised to 80%. Vaughns v. Board of Education of Prince George's County, 574 F.Supp. 1280, 1375 (D.Md. 1983), aff'd in part, rev'd in part on other grounds, 758 F.2d 983 (4th Cir.1985). Thus, the 40% range proposed by the District and adopted by this court is within constitutional limits.

### 2. Interim Goals

Plaintiffs have asked this court to mandate desegregation in one year. They point to the protracted nature of this litigation and assert that they are entitled to immediate relief. Nevertheless, this court is persuaded by expert testimony that such a requirement would be counterproductive.

Although plaintiffs characterize their plan as a voluntary plan, the District's expert, Dr. Christine Rossell, testified that a one-year plan would necessarily involve a higher number of mandatory reassignments (Tr. 9–186), increasing the likelihood that the community will react with bitterness and resistance to desegregation efforts. Such bitterness could be divisive, creating resentment and preserving racial isolation even as schools became more racially balanced. Dr. Rossell also indicated that severe mandatory measures could result in a higher enrollment loss of majority students (Tr. 4–127 to 4–158). A rapid decline in white enrollment could defeat the purpose of desegregating the district. The court has balanced these concerns against the plaintiffs' interest in an immediate and pervasive remedy, and determined that a more moderate course is appropriate. The court believes that the plan will be more successful if its voluntary aspects are given a chance to take effect.

On the other hand, the court is not persuaded that the District needs four years

to enroll only 75% of its students in desegregated schools.[5] Therefore, the court establishes the following interim goals: By December 31, 1986, 60% of all students shall be enrolled in desegregated schools. By December 31, 1987, 70% of all students shall be enrolled in desegregated schools. By December 31, 1988, 80% of all students shall be in desegregated schools. And, by December 31, 1989, 90% of all students shall be in desegregated schools. The San Jose Unified School District will be a unitary system when all of its students are enrolled in desegregated schools, and it has otherwise eliminated the vestiges of its past purposeful segregation. *See Swann,* 402 U.S. at 15, 91 S.Ct. at 1275.

## C. *Student Assignment Process*

The ability of the District to meet the above goals and place students in desegregated schools depends upon the success of its student assignment policy. The approach adopted by the court with respect to student assignment attempts to maximize the ability of a student and his or her parents to choose voluntarily which school the student will attend. Where students were previously limited to attending their neighborhood schools, the desegregation plan will now enable students to decide among a large number of alternative schools, many of which will have curricula that would not be available if the student were simply to attend his or her neighborhood school.

Among the alternatives available for voluntary student movement to desegregated schools are (1) attendance at district-wide magnet schools; (2) attendance at schools with specialty enrichment programs; and (3) attendance at schools with certain "programs of excellence" in which a student's attendance would improve the racial balance of both the sending and receiving school ("M to M" transfers).

The District has indicated that it expects such voluntary choices by students to be sufficient to lead to desegregation of most, if not all, of the district's schools by 1990 (Tr. 4–138; 5–110 to 5–111). *See* Exhibit D–2, Appendix ("Percent of Students in Desegregated Schools"). Nevertheless, an essential element of an effective desegregation plan—one that was initially omitted from the District's proposal—is the existence of a mandatory "backup" mechanism to ensure that students are reassigned to desegregated schools if voluntary choices

---

5. The District set interim goals of 55% in 1986–87, 65% in 1987–88, 70% in 1988–89, and 75% in 1989–90. It indicates, however, that approximately 46% of its students are currently attending desegregated schools (Tr. 2–84). An examination of the District's projected enrollment figures, *see* Exhibit D–22, shows that approximately 49.4% of its students would be in desegregated schools even if the District made no additional effort to desegregate. When Burnett School is converted to a dedicated magnet, many if not most of its 700 or so minority students will have to choose other middle schools in the District. Approximately 80 of those students would need to choose the Math/Science/Language program proposed for Bret Harte School to bring the percentage of students in desegregated schools to 55%. The District also has three elementary schools—Carson, Olinder, and Terrell—that will be within 1–4% of reaching racial balance even if the District does nothing. *See* Exhibit D–22. Minimum efforts to attract students to these schools will bring the percentage of students in desegregated schools to 60% in the first year. Balance can also be achieved at these and other schools by attracting students to the dedicated magnet at Horace Mann.

Significant desegregation gains can be made in either the first or second year by the conversion of San Jose High to a dedicated magnet. (Since that school will not be converted to a high school/middle school, the District may wish to convert it to a dedicated magnet in the first year instead of the second.) Minority students from San Jose High, and those currently attending Castillero will help to desegregate Leland High School, which will have a Communications/Media program and a Language Academy. The conversion of Gardner School to a dedicated magnet will also contribute significantly to further desegregation of elementary schools in the second year.

Finally, the District has represented to the court that in subsequent years the popularity of the magnets will increase substantially over time (Tr. 1–88 to 1–90, 5–110), contributing heavily to voluntary desegregation in subsequent years. Thus, the District should be able to achieve the interim goals established by this court without undue hardship or a significant number of mandatory assignments.

do not lead to sufficient desegregation. The primary mechanism for establishing these mandatory reassignments will be the implementation of enrollment caps to limit enrollment of new students in certain racially-isolated schools.

1. *Student Registration*

A requirement that all students explicitly choose their preferred schools is an important component of a desegregation plan that seeks to encourage students to enroll voluntarily in schools other than those in their neighborhood attendance area. The requirement that each student make such a choice means, according to plaintiffs' expert Michael Alves, that parents and students will give genuine consideration to which schools are most suited to their interests and whether their neighborhood school is necessarily the best selection (Tr. 6–71 to 6–74). Without such explicit choice, it is likely that students would continue to attend their neighborhood schools without adequate consideration of the alternatives.

Prior to the conclusion of the 1985–86 school year, every student in the district must participate in a student registration program. This program will be administered by the District and will include the distribution of descriptions of educational and other opportunities available to students at the various schools in the district. Each parent or guardian of a school-age child will receive descriptions of district-wide magnet schools available at the student's grade level, specialty enrichment programs available at the student's grade level, and any schools that would receive the student under an M to M transfer. Information regarding potential M to M transfers shall set forth whatever "programs of excellence" are offered at these schools. Parent information concerning student registration shall be made available in the language spoken by the parents. Printed brochures describing alternative schools shall be printed in English, Spanish, Vietnamese, and Portugese. *See* Exhibit D–17.

The District will then ask parents to indicate on their registration forms at least one, and preferably three, choices for a school to be attended by their children during the subsequent school year. After the 1986–87 school year, all new students to the district [6] shall be required to participate in the student registration program. Once registered pursuant to the above program, no student shall be required to participate in the District's subsequent annual registration programs until the last year of a school level, such as elementary, middle, or high school level, except that students changing schools for any reason must re-register.[7] The cost of developing and operating this registration system shall be borne by the District and shall be an expense of desegregation.[8]

The District shall establish by January 31, 1986, a Parent Information Center to prepare and distribute the above information regarding all district schools available under voluntary choice. The District shall hire a Parent Coordinator and sufficient assistants to assist in the dissemination of this information offered by the Parent Information Center to parents of existing and prospective students. The Parent Coordinator shall report on a regular basis to the administrative chief of the District's Office of Desegregation and shall act in accordance with instructions from that chief. Apart from disseminating information to parents about educational opportunities offered at the District's schools, the Parent Coordinator shall assist in recruitment of students for voluntary transfers in a manner consistent with the goals of the court's order. The cost of the Parent Information

---

6. Those students who previously attended a school in the district but have since attended a school other than one of the District's public schools shall be considered new students. *See* Stipulation, § 1.

7. Students changing schools from Cory Elementary (grades K–3) to Trace Elementary (grades 4–5) need not re-register.

8. Many of these provisions are contained in the stipulation filed by the parties on December 23, 1985. *See* Stipulation, § 1.

Center and Parent Coordinator and assistants shall be borne by the District and shall be an expense of desegregation.[9]

### 2. *Voluntary Assignment of Students*

A Student Assignment Officer for the District will be responsible for collecting all registration forms from parents. Those parents who do not return the form must be contacted by the Parent Information Center so that all forms are completed by a date set by the District. The Parent Information Center and the Parent Coordinator will be responsible for answering the questions of parents and students regarding their choices of schools.

The Student Assignment Officer will assign students as indicated on the registration forms. The forms will contain a single ranking of the various schools a student wishes to attend. The form should encourage parents and students to make at least three selections. These selections will include either district-wide magnets, schools featuring specialty enrichment programs, and schools available under M to M transfer. Students may also designate their neighborhood attendance area school as a choice.

Where a school's physical or programmatic capacity would not be exceeded by the enrollment of all students who have designated a school as their first choice, all such students shall be enrolled in that school, unless the enrollment of certain students is barred by an enrollment cap of the type described below.

If the first choices of students for a specific school exceed the physical or programmatic capacity of that school, then the students to be enrolled shall be selected as follows:

1) A student presently enrolled in a magnet school or specialty enrichment (magnet) program shall have first priority to continue in his or her school if he or she chooses on the enrollment form to return to that school. San Jose High students who have completed the eleventh grade when San Jose High is converted to a district-wide school may stay at San Jose High for their senior year.

2) A student who has a sibling at a particular school will receive second priority in assignment to that school if he or she selects this school on the registration form.

3) At schools that are not desegregated, priority shall be given to students whose enrollment would help the ethnic balance at the school.

4) A student who resides in the existing neighborhood attendance area shall have next priority.[10]

If a school becomes oversubscribed before exhausting a given category of priority, then selection shall be made on a random basis for students in that category.

Assignment of students to a district magnet school shall be made so that the enrollment of majority students at that school falls within a range of ± 5% of the proportion of majority students enrolled in all district schools at that level. If this

---

**9.** The stipulation filed by the parties contains a provision for hiring of a Parent Coordinator whose duties are set forth in this order. *See* Stipulation, § 8.

**10.** These priorities reflect a somewhat different ranking than that proposed by the District in Exhibit D–17. The District's proposed priorities would allow students in an existing attendance area to have priority over those students whose enrollment at a school would have a positive desegregative impact (on the sending school). The court has modified this priority in light of the possibility that schools with specialty enrichment programs or M to M "programs of excellence" might fill up with students from the

neighborhood attendance area. That would prevent students from other attendance areas who could contribute to desegregation from enrolling in that school.

The use of this priority for enrolling students who could desegregate such schools is more efficient than waiting for the possible imposition of enrollment caps at a later time. Such caps would not necessarily be applied, depending upon the overall desegregated condition of the district. Moreover, by the time caps are imposed on a school, those students who originally chose to attend a school outside their attendance area may have become discouraged by their initial inability to enroll in the school.

ratio would result in underutilization of the school, a district magnet may have a majority enrollment within ± 15% of the district-wide proportion of majority students at that level in the first year of operation, and ± 10% in the second year.[11]

If under this selection process a student is unable to attend his or her first choice school, the same process shall apply to the second, and, if necessary, third choice of the student. Those students who are unable to receive the choices written on their registration form shall be contacted by the Office of Desegregation and counseled about other schools that are available for their enrollment.

The Student Assignment Officer shall advise each student of his or her school assignment. The Student Assignment Officer will develop and maintain a waiting list for assignment to schools for which oversubscription occurs. Students who are not admitted to a school because of oversubscription will be advised when an opening for them occurs. At that time those students will be given the opportunity to remain at their existing school or transfer to the previously indicated school of choice.

The Student Assignment Officer will accept appeals of student assignments and will make the initial decision to grant or reject the appeal. The procedures and criteria for granting or rejecting appeals shall be in conformance with District policy, provided that the court's Monitor may review and overrule a decision by District authorities that is inconsistent with this order.

### 3. *Mandatory Assignment of Students*

If the District ascertains that it will be unable to meet the court's goals for the desegregation of the district in a given year, it shall employ enrollment caps as a means of establishing a limit on the enrollment of new students of a particular ethnicity at selected schools.[12] Enrollment caps are to be applied by the Student Assignment Officer, after consulting with the Office of Desegregation.

Caps are to be applied to assist the District in meeting the interim and final goals for the percentage of students who must attend desegregated schools. When an enrollment cap is placed on a school, any new students applying for assignment to the school (i.e., students transferring to the district or students entering the school from a different grade level) shall be admitted only if their enrollment further assists the school in becoming desegregated.[13]

The District shall have discretion in deciding how to implement enrollment caps to meet the interim and final goals for desegregated schools. Caps may first be applied to those schools in which imposition of the caps would cause the least student reassignment. In addition, the court encourages the District to make incremental progress in desegregating those schools that have the greatest racial imbalance through the use of enrollment caps. Exhibit D-19, ¶ 4. Caps may also be applied to desegregated schools that are in danger

---

11. *See* note 4 above.

12. The District presented evidence by Dr. David Bennett, Superintendent of the St. Paul schools and former Deputy Superintendent of the Milwaukee school system, on the use of enrollment caps. Dr. Bennett's testimony indicated that enrollment caps need not be employed to exclude students who currently attend a given school from attendance in subsequent years, but can achieve sufficient desegregation of a school simply by reassigning new students (Tr. 2–162 to 2–163). Bennett also testified that in St. Paul, enrollment caps were applied to nineteen schools requiring greater racial balance in September 1985. The caps were placed on enrollment for only about three weeks to achieve the necessary amount of student movement to bring the schools into balance (Tr. 3–4 to 3–5).

13. According to the District, the number of students "coming in and out" of the district during a year is approximately 30% of the total enrollment (Tr. 10–27 to 10–29). Moreover, the number of students making the transition from one grade level to another (i.e., elementary to middle or middle to high school) will also account for a high percentage of students. Thus, there is available, if necessary, a large pool of "new" students who could be assigned to a school other than the one(s) they have chosen by the establishment of enrollment caps so as to promote desegregation.

of becoming ethnically isolated. Exhibit D–19, ¶ 5. Overall enrollment caps, not applied to students of a particular ethnicity, may be necessary where schools are in danger of exceeding physical or programmatic capacity.

Those students who are reassigned by virtue of the placement of caps on their first choice school shall be given an opportunity to enroll in other schools they have designated. If none of a student's choices can be honored, the Student Assignment Officer shall designate a school for the student after consulting with the student's parents.

The Monitor shall exercise close supervision of the use of enrollment caps, as specified below, to ensure that they are applied in a nondiscriminatory fashion, and effectively promote desegregated schools.

### D. *School Pairings and Conversions*

As part of its original plan, the District proposed to reopen Cory Elementary School at the beginning of the 1987–88 school year and pair it with Trace Elementary School. Under this plan, Cory would be a K–3 school, and Trace a 4–5 school. The District also proposed to close three predominantly minority schools: Gardner Elementary School, Peter Burnett High School, and San Jose High School. Gardner was to become a dedicated high tech magnet of undesignated grade level, and Burnett was to become a dedicated Math/Science/Extended Day magnet for grades K–5. San Jose High School was to remain closed. The District did not plan to close any predominantly white schools.

In response to plaintiffs' plan and community concern that " 'every community ... needs to see around it each level of the educational system,' " *see* Defendant's Brief in Support of Its Proposed Desegregation Plan and in Opposition to Plaintiffs' Proposed Plan at 35 n. 40 (quoting the Brief Amicus Curiae of the Community for a Fair Desegregation Plan Amicus Brief at 4–5) [hereinafter cited as Defendant's Brief], the District agreed to keep San Jose High School open as a dedicated magnet, and proposed that it be converted to a high tech magnet for grades 6–12. Toward the end of the hearing, the District determined that Gardner School would continue to serve elementary (K–5) students (Tr. 7–4).

Plaintiffs agree with the proposal to convert San Jose High School to a dedicated magnet, *see* Exhibit P–23, at 16, but do not agree that it should be converted to a 6–12 school (Tr. 10–173 to 10–174). Plaintiffs also object to the pairing of Cory and Trace, and the conversion of Peter Burnett to an elementary school (Tr. 10–173, 10–175 to 10–180). The parties agree that Gardner School should be a dedicated elementary magnet (Tr. 9–235).

### 1. *Pairing Cory and Trace*

Plaintiffs object to the pairing of Cory and Trace on the ground that it will be disruptive for students progressing from the third to fourth grade, and will deter the desegregation of Trace because of the unusual grade level distribution (Tr. 10–175). Testimony by plaintiffs' expert, Mr. Michael Alves, indicated that a similar nonuniform pairing in Cambridge had deterred parents from enrolling their children in the school containing the higher grades (Tr. 6–65).

The District explains that it has chosen to pair the schools in order to more easily desegregate both Trace and Gardner Schools, without splitting grade-level peer relationships (Tr. 10–11). Under this plan, children who have developed peer relationships with classmates at Trace School, for example, could continue those relationships, either at Cory School or at Trace School.

The court is persuaded that any disruption that might occur due to the need to change schools after the third grade is offset by the ability to preserve peer relationships among students at specific grade levels. Moreover, the ability to maintain Trace as a desegregated school can be preserved by treating Cory and Trace as the same school solely for the purposes of the student assignment process. That is, grad-

uation from Cory to Trace will not be treated as a school level transfer. Students at Cory will be guaranteed a place at Trace, as they will be guaranteed continued enrollment at any other elementary school once they have been assigned. Only parents who do not wish their children to attend Trace will need to participate in the student assignment process when their children graduate from Cory.

### 2. Converting Gardner to a District-Wide School

The District's revised plan for Gardner School indicates that it will not be necessary to close Gardner in order to convert it to a dedicated magnet. *See* Exhibit D–20 (as amended by testimony, Tr. 9–222 to 9–223). During the 1986–87 school year, Gardner will remain an attendance area school. At the beginning of the 1987–88 school year it will become a district-wide dedicated magnet. Plaintiffs do not object to the District's plan to make Gardner a high tech magnet (Tr. 8–48 to 8–49, 9–235). However, in light of this court's rejection of the District's proposed conversion of Peter Burnett into an elementary magnet, the District may wish to add or shift the Math/Science/Extended Day magnet planned for Burnett to the Gardner magnet. As the District points out, Gardner is close to San Jose's Children's Science Museum, as well as the Hi-Tech Center. *See* Exhibit D–20.

### 3. Closing and Converting Peter Burnett

The District proposes to convert Peter Burnett Middle School into a district-wide dedicated elementary magnet. This has the effect of closing a middle school in a predominantly minority attendance area. Since the District planned no comparable closings or conversions for predominantly white schools, it has a heavy burden to justify its decision to close this school. *See Arvizu v. Waco Independent School District,* 495 F.2d 499, 505 (5th Cir.1974); *Bivens v. Bibb County Board of Education,* 460 F.2d 430, 433 (5th Cir.1972); *Haney v. County Board of Education,* 429 F.2d 364, 372 (8th Cir.1970). The District has not met this burden.

Plaintiffs object to the conversion of Peter Burnett to an elementary school. They point to its "good fit" as a middle school (Tr. 9–34 to 9–38),[14] and its inappropriateness as an elementary school (Tr. 10–178 to 10–179). Specifically, the physical plant is designed to accommodate secondary students (Tr. 10–178). It has a large gym that is not scaled to a size that would be convenient for elementary students, shops and cooking facilities that would be wasted on elementary students, and a large swimming pool that could be unsafe for young children. It is much larger than any of the schools that the district has found appropriate for elementary schools, with a capacity of 1217,[15] compared to 840 for the largest elementary school campus and 420 for the smallest elementary campus. Finally, the school is located in an area with heavy traffic, compounding the difficulty of ensuring the safety of young children on an oversized campus (Tr. 10–178).

14. Plaintiffs' expert, Dr. Richard Valencia, testified about the developing "goodness of fit" at Burnett School. He cited factors such as improving test scores, students' use of the media center before and after school, use of the computer-assisted instruction lab by disadvantaged students, participation in extracurricular activities, the university outreach program, parental involvement, and the nature and condition of the school facilities (Tr. 9–36 to 9–37).

15. A comparison of the physical capacities may be more appropriate given the different methods by which programmatic capacities are determined at each school level. *See* Exhibit D–23. For example, the program capacity at Bur-

nett may be more than 1217 when the double use of Kindergarten classrooms is factored in. The correct figure for Burnett's pupil capacity is not available; but the court notes that Burnett has a program capacity comparable to that of Markham Middle School. Markham, the smallest middle school, is 129,923 total square feet, while the largest elementary school, Washington, is only 47,728 total square feet. The smallest elementary school currently in operation, Empire Gardens, is only 21,024 total square feet. *See* Exhibit J–5. These figures reflect a belief that elementary schools should be much smaller than middle schools.

The District contends that Burnett is needed for the anticipated increase in elementary enrollment for northern attendance areas (Tr. 10–157). *See* Exhibit D–20. The District asserts that the 8160 programmatic capacity of the twelve northern elementary schools,[16] *see* Exhibit D–23, will not be enough to house the 7366 students it projects will reside in those attendance areas, *see* Exhibit D–24, because 90% loading is "more realistic," *see* Exhibit D–20. The District offers no support for its contention that 90% loading is more realistic, and the court notes that the District has exceeded this 90% figure at 6 of the 10 northern elementary schools currently in operation. Moreover, the projected 1990–91 enrollment is only 90.2% of the projected capacity in those schools. Even if the court accepts 90% as an optimal loading figure, this small deviation (22 students) does not justify the conversion of a 1200–plus capacity middle school into an elementary school. Common sense also indicates that the projected increase in elementary enrollment will be felt in the next several years at the middle school level. This suggests that the District will need both of its northern middle schools in the not too distant future.

The District also ignores the potential impact of desegregation on the number of new students that will need to be housed in northern schools. Noticeably absent from the District's "Expanded Rationale for the Use of Gardner Elementary School in S.J. U.S.D. Desegregation Plan," Exhibit D–20, were figures showing the projected enrollment in central and southern elementary schools. The District's figures indicate that once Cory and Horace Mann are re-opened, its total elementary school capacity will be 16,720, of which 720 will be leased. *See* Exhibit D–23. The District has not offered evidence that it will be unable to handle the district-wide increase in enrollment under a successful desegregation plan that distributes students throughout the District. In fact, Dr. Rossell's latest report indicates that the total elementary enrollment projected for 1990 is 14,005, or 83.8% of the district-wide elementary capacity. *See* Exhibit D–2, at Appendix 2f. The District also has several elementary schools that were closed in recent years, and other land that has not been developed. Since the 90% level will not be reached in the northern schools until 1990–91, *see* Exhibit D–24, the District will have time to adjust to its anticipated increase in elementary enrollment without converting Burnett School.

Finally, the court must reject the plan to close Burnett to northern middle school students, because it finds that the alternatives—i.e., sending them to San Jose High School or involuntarily busing them to distant middle schools—are inconsistent with an equitable desegregation plan. Some of these students will, of course, have to leave Burnett when it is converted into a district-wide middle school. But, plaintiffs do not object to this proposal (Tr. 9–235). They object to the District's plan because it singles out northern schools for experimentation (Tr. 10–172). The plan also contemplates that Peter Burnett students will be the only students forced out of their school without a chance to re-enroll under the District's student assignment process. Since only northern minority students will be displaced by the District's plans to open more district-wide schools, this additional burden on the plaintiff class is unacceptable.

### 4. *Converting San Jose High School to a 6–12 School*

The court must also reject the District's offer to mitigate this inequity by allowing Burnett students to attend San Jose High, which the District asserts is more centrally located (Tr. 10–14). The court finds persuasive testimony by plaintiffs' experts, Mr. Alves, Dr. Willie, and Dr. Valencia, indicating that such an idea is educationally unsound. They assert that this proposal runs counter to conventional wisdom about appropriate grade levels (Tr. 8–49 to 8–50,

---

**16.** These schools are Bachrodt, Cory, Anne Darling, Empire Gardens, Gardner, Grant, Hester, Lowell, Horace Mann, Olinder, Trace, and Washington.

9–76 to 9–79, 10–72 to 10–73). Moving the middle school to the high school runs the unnecessary risk of exposing youths at too early an age to more pseudo-sophisticated ideas about social relationships, drugs, and dropping out.

The District did not counter this testimony with evidence that its plan was the product of a carefully considered change in educational policy. They were able to name only a few schools in other districts that had similar grade structures (Tr. 10–18 to 10–19), and did not present evidence about the enrollments or campus designs of such schools. The District was also unable to explain to this court how San Jose High could be remodeled to protect younger students from unplanned and unchaperoned encounters with older students.

A comparison of the parties' Joint Pretrial Statement, filed December 2, 1985, and Defendant's Brief, filed December 6, 1985, makes it clear that the proposal to make San Jose High available for a middle school magnet was made hastily and without careful consideration.[17] Moreover, the court notes that the District has no other plans to consolidate a high school with a middle school (Tr. 10–19). And, the District's testimony regarding the cooperation between particular pairs of schools (Tr. 10–19 to 10–20) ignores the court's concern that the District will be unable to monitor the interaction of younger and older students of widely disparate levels of maturity. The San Jose High School facility was not designed to accommodate a dual-campus configuration.

Finally, the court believes that the positive effect of creating a district-wide magnet of interest to middle school students will be offset by their parents' reluctance to send preteens and young adolescents to school with near-adults. Thus, the plan to create a 6–12 school is not only educationally questionable, but inconsistent with the effort to desegregate. The court, therefore, declines to place its imprimatur on the District's proposal as part of this desegregation plan. San Jose High, Peter Burnett, and Gardner will become district-wide magnets at their current grade levels.[18]

E. *Faculty and Staff Assignment and Hiring*

The Ninth Circuit specifically found illegal the District's policy of intentionally assigning faculty and staff to schools on the basis of race. *Diaz*, 733 F.2d at 670, 675. The court also found the District's racially-based assignment policy "among the most important indicia of a segregated school system." *Id.* The parties agree that this court's remedial plan must address the assignment of faculty and staff.

The court believes that it can adopt a more effective assignment policy for faculty and staff by holding a separate hearing on this issue. Temporarily deferring decision on this part of the plan will not prejudice the parties, nor will it affect the Dis-

17. In the Joint Pretrial Statement, filed December 2, 1985, the parties listed as a remaining disputed factual issue: "How would the closure of San Jose High School impact the minority community?" *See* Joint Pretrial Statement at 4. Two days later, on December 4, 1985, the District indicated at a prehearing conference that it had tentatively agreed to keep San Jose High School open. And, on December 6, 1985, the District filed its reply to plaintiffs' desegregation plan, stating: "[T]he District now proposes to convert San Jose High School into a dedicated magnet.... The present inclination of the District ... is to have the magnet ... encompass grades 6 through 12." Defendants' Brief at 35. Thus, the District did not have time, in that short period, to study and consider the potential ramifications of this dramatic change in its grade structure policy.

18. Plaintiffs suggest that Peter Burnett should contain the high tech middle school magnet that would have been placed at San Jose High School (Tr. 10–73). The District asserts that it would not be cost efficient to have three high tech magnets (Tr. 10–15). The court strongly urges the District to implement the three-school feeder system of high tech magnets (Gardner to Burnett to San Jose High School) if it is feasible. If not, the court suggests that the District consider whether a middle school high tech magnet would be more appropriate or more attractive than an elementary high tech magnet. The court adheres, however, to its policy of allowing the District to determine the appropriate type and location of particular magnets.

trict's ability to receive funding from the State for the other portions of this court's desegregation plan. The increased time will permit the parties to concentrate more fully on this important aspect of the plan and to solicit the views of the representatives of the affected employee groups as to proper methods for implementing the reassignment policy. The court can learn of the views of the employee groups at the hearing. The court, therefore, sets hearing on this issue for February 20, 1986, at 10:00 A.M. The court directs the District to file its brief on this issue no later than January 23, 1986. The plaintiff class will have two weeks to respond and the District will have an additional week for any reply.

The plaintiff class raises an additional concern regarding faculty and staff. Plaintiffs argue that the court should require the District to engage in affirmative action in its hiring of faculty and staff. The District contends that this issue is beyond the scope of the court's remedial powers.

The Supreme Court has often stated the principles a district court should employ in fashioning a remedy in a school desegregation case. The court may exercise its remedial powers "only on the basis of a constitutional violation." *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971). "The task is to correct, by a balancing of the individual and collective interests, 'the condition that offends the Constitution.'" *Id.* "As with any equity case, the nature of the violation determines the scope of the remedy." *Id. See also Dayton Board of Education v. Brinkman*, 433 U.S. 406, 420, 97 S.Ct. 2766, 2775, 53 L.Ed.2d 851 (1977).

The nature of the District's violation in this case does not justify imposing an affirmative action plan for hiring. There has been no finding that the District has illegally discriminated against minorities in hiring. The Ninth Circuit discussed faculty and staff assignment, not the separate issue of faculty and staff hiring. *Diaz*, 733 F.2d at 670.

Plaintiffs cite inapposite cases in support of their position. Most of the cases cited by plaintiffs involve reassignment of segregated faculty, not affirmative action in hiring. *See, e.g., Swann*, 402 U.S. at 19, 91 S.Ct. at 1277; *Zaslawsky v. Board of Education*, 610 F.2d 661, 663, 664 (9th Cir. 1979). In other cases plaintiffs cite, courts have explicitly found that the defendant had discriminated in hiring, *see, e.g., Morgan v. Kerrigan*, 530 F.2d 401, 405 n. 1 (1st Cir.), *cert. denied*, 426 U.S. 935, 96 S.Ct. 2648, 49 L.Ed.2d 386 (1976), or that the defendant had voluntarily agreed to an affirmative action program, *see Liddell v. State of Missouri*, 731 F.2d 1294, 1300, 1325 (8th Cir.) (en banc), *cert. denied*, — U.S. —, 105 S.Ct. 82, 83 L.Ed.2d 30 (1984).

Furthermore, *United States v. Texas Education Agency*, 467 F.2d 848 (5th Cir. 1972), does not authorize the court to adopt an affirmative action plan in this case, as plaintiffs argue. The "principal concern" of *Texas Education Agency* was to ensure that minority faculty would be fairly distributed throughout the school district. *Fort Bend Independent School District v. City of Stafford*, 651 F.2d 1133, 1137 (5th Cir.1981). *Texas Education Agency* required the defendant to undertake an affirmative action program only because the percentage of minority teachers in the district was so small (3%) that "it was impossible to distribute them in any meaningful way throughout the system." *Fort Bend Independent School District*, 651 F.2d at 1137. That concern does not apply to the present case since minorities compose roughly 20% of the faculty population.

While declining to mandate an affirmative action program as part of this desegregation plan, the court nevertheless encourages the District to adhere to its stated policy of aggressively recruiting qualified minority applicants. *See* Exhibit P–3 at 2.

## F. *The Compliance Monitor*

The parties have stipulated to many provisions, including one describing the appointment and duties of a compliance moni-

tor. While the court accepts some of these provisions, it rejects others as inconsistent with the function and effectiveness of the Monitor as an arm of the court. The Monitor is not the agent of either party; he or she will serve the court, and will be independent of both the District and the plaintiff class.

### 1. Selection of the Monitor

The Monitor will be selected by the court with the advice of both parties. Within twenty (20) days from the entry of this order, the parties will each submit a confidential list of three to five individuals who would be qualified to carry out the responsibilities of the Monitor. The parties should indicate each person's relevant background and experience. The court will attempt to select a suitable candidate from these lists, but reserves the right to select an unlisted individual after consultation with the parties.

### 2. Duties of the Monitor

The Monitor shall function as the eyes and ears of the court, to ensure that the District carries out its desegregation responsibilities in compliance with this order. The duties of the Monitor shall include:

(1) Reviewing data and information collected by the District, as listed below;

(2) Making recommendations to the District, based upon that review, regarding changes in the District's performance or policies that the Monitor believes will help the District achieve compliance with this order;

(3) Making recommendations to this court regarding changes in this order that may be appropriate, particularly those made necessary by significant changes in circumstances;

(4) Advising this court of incidents of significant noncompliance with this order by the District, after attempts to negotiate and obtain appropriate compliance or corrective action from the District have proven unsuccessful;

(5) Providing a semi-annual report to the parties and to this court on the desegregative efforts of the District and its progress toward a unitary system, and of his/her activities as the Monitor;

(6) Performing such other tasks as the court may direct from time to time;

(7) Monitoring the racial balance of classrooms to determine whether a significant number of classes are racially imbalanced,[19] and advising the court whether students in "self-contained" GATE programs are racially isolated from other students in the host schools;[20] and

**19.** Plaintiffs' expert, Michael Alves, testified that he had found 89 racially imbalanced classes (90–100% majority or minority) in 7 San Jose elementary schools (Tr. 7–79 to 7–80). While this evidence is not sufficient to establish that the District has a policy of segregating students by race at the classroom level, it is sufficient to suggest that some scrutiny of classroom assignments is warranted. Should the Monitor discover that a significant number of classes are either disproportionately minority or majority, he/she will investigate to determine whether that pattern is justified by educationally or demographically valid considerations. In the absence of such justification, the Monitor may treat such a pattern of racially isolated classrooms as an incident of significant noncompliance, and proceed accordingly.

**20.** Plaintiffs' expert, Dr. Thomas Carter, suggested that it would be inappropriate to locate a predominantly white GATE program in a minority school with a significant number of limited English students (Tr. 9–180 to 9–182). Plain-

tiffs contend that the placement of such a class would have an illusory desegregative effect, because the disparate abilities of the students would preclude meaningful social and academic interaction. Plaintiffs' expert, Mr. Alves, indicated that this danger would be of particular concern where the GATE class is self-contained—that is, where GATE students are all in a special class and receive most of their instruction in isolation from other students in the host school (Tr. 7–74).

Superintendent Cortines admitted that the District had not made significant efforts in the past to identify gifted and talented minority students (Tr. 1–62). He assures the court, however, that this problem has been corrected (Tr. 1–63). Nevertheless, if the GATE program remains predominantly white because of the District's past failure to identify gifted minorities, the placement of such a program in a minority school could merely manipulate enrollment figures without contributing legitimate progress toward desegregation.

(8) Monitoring the granting of appeals to the student assignment process in the following manner:

The Monitor shall be notified immediately of the granting of an appeal of a student assignment. The Monitor will review the appeal. In the event that the Monitor finds that the appeal was granted in violation of this order, he/she will have the power to overrule the appeal and implement the original assignment. Any order by the Monitor overruling an assignment appeal shall be made within ten (10) days of the delivery to the Monitor of the record of the District's action granting the requested transfer. Either party may appeal the Monitor's decision by motion to this court.

### 3. *The District's Responsibilities*

The Monitor shall maintain an office independent of the District's offices. The District shall provide a reasonable amount of funds for professional, secretarial, and administrative support for the Monitor to fulfill his/her functions. The cost of such support shall be borne by the District as a cost of desegregation. The compensation of the Monitor shall be determined by the court, but shall be paid by the District as an expense of desegregation.

The District shall maintain records by school, grade level, and ethnicity, and by classroom assignment where indicated, in the following areas:

(1) Student achievement on standardized tests;

(2) Student suspensions, including in-school suspensions;

(3) Student expulsions;

(4) Student dropouts;

(5) School assignment transfer requests and action taken thereon;

(6) Student transportation;

(7) School safety and security;

(8) Student and staff participation in extra-curricular activities;

(9) Special education;

(10) Bilingual education;

(11) Faculty and administrative staff assignments;

(12) Student school and classroom assignments;

(13) School capacities;

(14) Program locations;

(15) Placement and duration of enrollment caps; and

(16) Such other information as the Monitor determines is necessary to enable him/her to carry out his/her responsibilities as Monitor.

The District will provide the Monitor with reports reflecting such data, and with any other routine reports showing information pertinent to the desegregation of the District. Such reports shall be submitted in a timely fashion, and in such form as the Monitor deems necessary for the performance of his/her duties. Data shall be collected during the normal course of business, and reports shall be filed immediately thereafter. The District and the Monitor shall agree upon a schedule for submission of such reports.

The Monitor shall have the authority to visit school sites and interview District personnel so long as such visits and/or interviews do not unduly disrupt normal school operations.

### G. *Further Provisions*

The parties have stipulated to other remedial provisions that are to become part of this desegregation order. Those provisions are set out below.

Plaintiffs have asked this court to prevent the placement of GATE magnets at minority schools with large bilingual programs (Tr. 10–212 to 10–213). As indicated above, this court does not wish to limit the District's ability to select or adjust its magnet programs. The court will, however, give the Monitor discretion to discount the District's claim that a school is desegregated, if he/she finds that students in such schools remain in racially isolated classrooms or programs.

### Student Discipline

The District will maintain records showing on a school-by-school basis and by ethnicity and grade level within each school all suspensions and expulsions and other incidents involving the application of significant forms of discipline to correct aberrant student behavior. The District will monitor the collected data relating to the imposition of discipline for the purpose of determining whether or not there appears to be abnormally greater or less discipline being imposed upon any identifiable ethnic groups. If there appears to be any ethnically discriminatory application of discipline, the District will devise and implement appropriate corrective action. The cost of developing and administering this system shall be borne by the District and shall be an expense of desegregation.

### Budgetary Consultant

The District will locate and hire a consultant who shall be responsible to the District and who shall advise the District from time to time, as the District deems appropriate, on appropriate means and techniques by which the District may maximize its recovery of funding for desegregation through grants and other available sources.

The person or entity selected to serve as budgetary consultant to the District shall meet with the mutual approval of the District and plaintiffs herein, which approval shall not be unreasonably withheld by any party. The expense of hiring the consultant shall be borne by the District and shall be an expense of desegregation.

### Dropout Prevention Program

The District will maintain data by school, by grade level, and by ethnicity relating to student dropouts from the educational program offered by the District. The District will develop and implement a program or programs, which may be changed from time to time as circumstances suggest, to (a) identify students who are likely to become dropouts and (b) prevent or minimize the likelihood of the occurrence of dropouts. The cost of these programs shall be borne by the district as an expense of desegregation.

### Facilities Audits

The District will develop a definition of the objective, non-discriminatory criteria to be used when determining whether or not a school in the District should be opened or closed. The District will maintain records showing the amount of monies spent on properties and facilities within the District. The District will also maintain records showing inventories of relocatable buildings and the distribution of equipment within the District. The District will conduct an audit of its facilities and will use this audit as the basis for the creation of a Unified Facilities Plan. The purpose of that plan will be to ensure equitable distribution of equipment and facilities among all the schools in the District. The cost of the development of this Plan and its subsequent maintenance and review will be borne by the District as an expense of desegregation.

### Transportation

On or before June 30, 1986, the District will cause to be performed an audit of the transportation capabilities of the District. Based upon that audit the District will prepare a transportation plan showing the most efficient and effective means by which those capabilities can be used to meet the District's transportation needs, which include any transportation opportunities offered or mandated pursuant to the Order. Said audit shall also include recommendations for additional transportation capabilities that are needed to facilitate implementation of this Court's remedial order. The cost of the audit and the development and operation of a transportation plan shall be borne by the District and shall be an expense of desegregation.

### Extracurricular Activities

The District will establish a policy guaranteeing equal access to extracurricular activities and opportunities at all schools and develop a standardized procedure for identifying interest in extracurricular activities.

### Bilingual Education

So long as present funding continues, San Jose Unified School District commits to

the continuation of its present bilingual-multi-cultural program to serve the needs of limited English proficient students. San Jose Unified School District retains the right, however, to modify this program for the purpose of serving the goal of acquiring English language proficiency and the goal of fostering academic skills in content areas, such as math, reading and science. In the event that reductions in California State or Federal funding occur, the San Jose Unified School District commits itself to use its best efforts in pursuing alternative sources of funding for the program to serve limited English proficient students.

## CONCLUSION

. The District's position throughout the remedial phase of this litigation has been that voluntary choice of desegregated schools, particularly through the use of magnet schools, will lead to effective and stable desegregation if given an opportunity to succeed. The remedy ordered by the court is one that encourages this use of voluntary movement by students to desegregated schools.

In seeking to allow the District the opportunity to exhaust the potential for voluntary movement, the court is nevertheless mindful of its overriding duty to ensure effective desegregation of a school system in which plaintiffs have been denied their constitutional rights for over fourteen years. Consequently, this order establishes ambitious yet realistic goals for the District to meet over the course of the next four school years to satisfy its duty to provide desegregated education to children in public schools. If voluntary enrollment measures are unavailing, the District must resort to mandatory assignments to ensure the provision of desegregated schooling.

In many respects, then, the burden of desegregation is not merely on the defend-

ant board members and school authorities but on the broader San Jose community as well. If the District's hopes for a largely voluntary path to desegregation are to be realized, parents and students must be willing to try new schools and new programs that are offered in an environment of full ethnic representation. Whether student assignments are achieved voluntarily or involuntarily, however, the degree of success of desegregation will reflect the strength of the community's commitment to improving the quality of education bestowed upon its children in the public schools.

The court therefore orders the above remedial relief.

IT IS SO ORDERED.

## ORDER RE FACULTY DESEGREGATION

### INTRODUCTION

On December 31, 1985, this court issued its Memorandum and Order re Desegregation Remedy, describing the process by which the San Jose Unified School District will be desegregated. The court did not fashion a remedy for faculty desegregation at that time, because it did not have enough evidence upon which to base its decision. On February 20, 1986, this court held a further evidentiary hearing on the issue of faculty and administrative reassignments. The court sets forth below its orders regarding the desegregation of the faculty and administrative staff.

### FACULTY DESEGREGATION

The Ninth Circuit found that the District had intentionally "assigned faculty and staff on the basis of ethnic origin without any plausible neutral justification." *Diaz v. San Jose Unified School District*,[1] 733 F.2d 660, 675 (9th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 2140, 85 L.Ed.2d 497 (1985). The court also found that this

1. Previous orders in this case have been reported under the name *Diaz v. San Jose Unified School District.* By its Order re Class Certification and Substitution of Class Representatives dated December 31, 1986, this court substituted David Jose Vasquez for Arnulfo Diaz as the first named party representative. Therefore, this case will hereafter be reported under the name *Vasquez v. San Jose Unified School District.*

racially-based assignment policy was "among the most important indicia of a segregated school system." *Id.* at 670. In light of this finding, the District must implement a teacher assignment policy that ensures that schools are not racially identifiable by reference to their faculties.

A. *Definition of a Desegregated School*

For purposes of faculty desegregation, a school will be considered desegregated and not racially identifiable if it is (1) an elementary school with a minority faculty representation within ± 10% of the district-wide minority faculty representation at the elementary school level, or (2) a middle or high school with a minority faculty representation within ± 5% of the district-wide proportion of minority faculty at the middle or high school level. For example, if minority full-time equivalents ("FTEs")[2] represent 25% of the faculty full-time equivalents district wide at the elementary level, then an elementary school will be desegregated if its minority faculty representation falls between 15% and 35%. If the district-wide proportion of minority faculty at the middle school level is 15%, then a middle school will be desegregated if its minority faculty representation is between 10% and 20%. A similar 10% range will apply at the high school level based on the district-wide proportion of minority faculty at that level.

The court adopts a range narrower than that proposed by the District for the middle and high school levels, because the disproportionately small minority faculty representation at those levels precludes the use of a broader range. Should the minority faculty representation at those levels increase significantly before the District is released as a unitary system, the District may request that the court adjust this definition to allow a broader range. Similarly, if the minority faculty representation at the elementary school level drops significantly, plaintiffs may request that the court adopt a narrower range for that level.

The District proposed that the court exclude bilingual teachers from faculty desegregation because the minority representation among such teachers is disproportionately high. The court must reject this proposal for three reasons. First, the District did not provide a satisfactory legal or factual basis to support such an extraordinary provision. It is clear that the refer-

ence to "specialized faculty positions" in *Nesbit v. Statesville City Board of Education*, 418 F.2d 1040, 1042 (4th Cir.1969), was not intended to exclude so broad a category of teachers. Second, such a proposal might hamper desegregative efforts by (a) lowering morale among nonbilingual teachers who may feel that they are being treated unfairly, and (b) creating a disincentive for the District to hire minorities in programs other than the bilingual program. Third, such a provision would require the court to find that a majority-impacted school with 2 minority FTEs and out of 29 FTEs is not racially identifiable when compared to a minority-impacted school with 15 minority FTEs out of 25 FTEs. This court is unwilling to make such a finding.

The District has expressed its concern that it will be unable to comply with this court's order while maintaining its bilingual program in accordance with state law. The District admits, however, that it has not determined what impact the student reassignment process will have on the distribution of students needing bilingual education. The District has assured this court that the bilingual program will follow those students who need it. If the District conveys this assurance to such students, they will feel free to move to schools throughout the District. Such movement is necessary to ensure the success of the voluntary aspects of the desegregation remedy. It will also allow the District to redistribute bilingual teachers so that they are not concentrated in particular schools. Finally, if after making every reasonable effort the District is unable to comply with both state law and this order, the District may seek a waiver from the requirements of this order for particular schools where the number of minority FTEs exceeds the maximum.

B. *Timetable for Implementation*

The District has asked this court to delay implementation of this plan for a year in order to allow teachers to transfer voluntarily. Yet, the District has not offered legal precedent or presented circumstances that would justify such a delay. Therefore, beginning with the 1986–87 school year, all schools in the district shall be desegregated with respect to faculty racial composition.

The District has indicated that faculty assignments do not stabilize until the sec-

---

**2.** A full-time equivalent or FTE is a funding position equivalent to one full-time employee. An FTE may be filled by a number of part-time employees.

ond month of each school year. Therefore this court will measure compliance with the requirements of this order as of October 30th of each year. Subsequent changes in faculty assignments must be made in a manner that is consistent with maintaining schools that are not racially identifiable by reference to faculty composition.

The District may institute a program of voluntary transfers to fill vacancies and new positions throughout the rest of the present school year and the summer. Should these voluntary measures prove to be insufficient, the District shall mandatorily assign teachers in a manner that is consistent with this order. The District may follow the procedures outlined in the agreement negotiated with the teachers' collective bargaining unit, *see* Exhibit 6, except that it may not postpone the institution of involuntary transfers until the 1987–88 school year.

## ADMINISTRATIVE DESEGREGATION

The parties have stipulated to a comprehensive list of administrative assignments. The court approves this stipulation, and incorporates the list of reassignments as an appendix to this order. The District shall make future appointments of school staff and administration in a manner that conforms with the continued desegregation of such employees. The District must maintain schools that are not racially identifiable by reference to administrative assignments.

## CONCLUSION

The remedy ordered by this court is one that will redress the District's past practice of assigning teachers and administrators to particular schools on the basis of ethnic origin. The court encourages teachers to voluntarily transfer to other schools in an effort to desegregate faculties throughout the District. Whether or not such voluntary efforts are sufficient, however, the faculty of the San Jose Unified School District must be desegregated by October 30, 1986.

IT IS SO ORDERED.

APPENDIX
1986–87 ADMINISTRATOR ASSIGNMENTS
Elementary Schools

| School | Current Principal | 1986–87 Principal |
| --- | --- | --- |
| Allen | Patti Gregory (majority) | Linda Gonzalez-Baker (from Empire Gardens) (minority) |
| Almaden | Myrna Fleckles (majority) | No change |
| Bachrodt | Tom Nanamura (minority) | No change |
| Booksin | Roberta Bondelie (minority) | No change |
| Carson | Nancy Locke (majority) | No change |
| Anne Darling | Cecilia Espalin (minority) | Jerry Kristal (from Randol) (majority) |
| Empire Gardens | Linda Gonzalez-Baker (minority) | Lenore Shelley (from Willow Glen) (majority) |
| Gardner | Lydia Dague (minority) | No change |
| Grant | Laura Kidwiler (minority) | No change |
| Graystone | Mary Maxwell (majority) | Cecilia Espalin (from Anne Darling) (minority) |
| Hacienda/Valley View | Bruce Bondelie (majority) | No change |
| Hester | Robert Dalton (majority) | No change |

## Elementary Schools

| School | Current Principal | 1986–87 Principal |
|---|---|---|
| Horace Mann | | Mary Maxwell (from Graystone) (majority) |
| Los Alamitos | Roger Banta (majority) | No change |
| Lowell | Al Moreno (minority) | No change |
| Olinder | Rosemary Young (majority) | No change |
| Randol | Jerry Kristal (majority) | Vacant |
| Reed | Gerald Weltzin (majority) | No change |
| Schallenberger | Charles Orr (majority) | Vacant |
| Simonds | Marsha Gilpatrick (majority) | Carol McElroy (from Washington) (minority) |
| Terrell | Jack Fix (majority) | No change |
| Trace | Vacant | Patti Gregory (from Allen) (majority) |
| Washington | Carol McElroy (minority) | Marsha Gilpatrick (from Simonds) (majority) |
| Willow Glen | Lenore Shelley (majority) | Vacant |

## Middle Schools

| School | Current Staff | Position | 1986–87 Principal |
|---|---|---|---|
| Bret Harte | Jayne Brill (majority) | Principal | No change |
| | Vacant | Assist. Prin., Student Serv. | Richard Ramirez (from Lincoln) (minority) |
| | Sverre Knapstad (majority) | Assist. Prin., Instruction | No change |
| | Elaine Farace (majority) | Dean of Guid. | No change |
| Burnett | Jesse Rizzo (minority) | Principal | Cotine Weltzin (from Markham) (minority) |
| | Robert Lauderdale (majority) | Assist. Prin., Student Serv. | Vacant |
| | Marcus Martel (minority) | Assist. Prin., Instruction | Vacant |
| | Arlene Hammer (majority) | Dean of Guid. | Peggy Schwartz (from Steinbeck) (majority) |

## Middle Schools

| School | Current Staff | Position | 1986–87 Principal |
|---|---|---|---|
| Castillero | Vacant | Principal | |
| | Ken Mavor (majority) | Assist. Prin., Student Serv. | No change |
| | Delores Rodriguez (minority) | Assist. Prin., Instruction | No change |
| | Jack Nishihara (minority) | Dean of Guid. | No change |
| Hoover | George Romero (minority) | Principal | No change |
| | Celso Rodriguez (minority) | Assist. Prin., Student Serv. | No change |
| | Al Warren (majority) | Assist. Prin., Instruction | No change |
| | Marcella Fehely (minority) | Dean of Guid. | Beverly Wagener (from John Muir) (majority) |
| Markham | Cotine Weltzin (minority) | Principal | Hal Garrett (from John Muir) (majority) |
| | Dale LaMar (majority) | Assist. Prin., Student Serv. | No change |
| | Pat Beebe (majority) | Assist. Prin., Instruction | Marcus Martel (from Burnett) (minority) |
| | Elizabeth Denny (majority) | Dean of Guid. | No change |
| Muir | Hal Garrett (majority) | Principal | Jesse Rizzo (from Burnett) (minority) |
| | Vacant | Assist. Prin. Student Serv. | Pat Beebe (from Markham) (majority) |
| | Marilyn Johnson (majority) | Assist. Prin. Instruction | No change |
| | Beverly Wagener (majority) | Dean of Guid. | Arlene Hammer (from Burnett) (majority) |
| Steinbeck | Norris Hill (majority) | Principal | No change |
| | Dan Flanagan (majority) | Assist. Prin., Student Serv. | No change |
| | Barbara Parisius (majority) | Assist. Prin., Instruction | No change |
| | Peggy Schwartz (majority) | Dean of Guid. | Marcella Fehely (from Hoover) (minority) |

## High Schools

| School | Current Staff | Position | 1986–87 Principal |
|---|---|---|---|
| Gunderson | Basil Huffman (majority) | Principal | No change |
| | Pat Cabral (majority) | Assist. Prin., Student Activ. | Vacancy |
| | Don Bell (majority) | Assist. Prin., Discipline | John Berney (from Leland) (majority) |
| | Bob McPeek (majority) | Assist. Prin., Instruction | No change |
| | Marsha Wadley (majority) | Dean of Guid. | No change |
| Lincoln | Art Garcia (minority) | Principal | No change |
| | Richard Ramirez (minority) | Assist. Prin., Student Activ. | Larry Steele (from Willow Glen) (majority) |
| | Barbara Lacerenza (minority) | Assist. Prin., Discipline | No change |
| | Iris Berke (majority) | Assist. Prin., Instruction | Pat Cabral (from Gunderson) (majority) |
| | Nicky Miyamura (minority) | Dean of Guid. | Lewis Laird (from Pioneer) (majority) |
| Leland | James Baughman (majority) | Principal | No change |
| | Joan Mulvihill (minority) | Assist. Prin., Student Activ. | No change |
| | John Berney (majority) | Assist. Prin., Discipline | Ed Freed (from San Jose) (majority) |
| | Karl Pedersen (majority) | Assist. Prin., Instruction | No change |
| | Doris Geister (majority) | Dean of Guid. | No change |
| Pioneer | Ed Barrows (majority) | Principal | No change |
| | Sal Cesario (majority) | Assist. Prin., Student Activ. | No change |
| | Dave Beymer (majority) | Assist. Prin., Discipline | No change |
| | Ardith Webb (majority) | Assist. Prin., Instruction | No change |
| | Lewis Laird (majority) | Dean of Guid. | Nicky Miyamura (from Lincoln) (minority) |
| San Jose | Chuck Benjamin (majority) | Principal | No change |
| | Virginia Bartholow (majority) | Assist. Prin., Student Activ. | Don Bell (from Gunderson) (majority) |

### High Schools

| School | Current Staff | Position | 1986–87 Principal |
|---|---|---|---|
| | Oreen Gernreich (majority) | Assist. Prin., Discipline | No change |
| | Ed Freed (majority) | Assist. Prin., Instruction | Virginia Bartholow (from San Jose) (majority) |
| | Pat Arness (majority) | Dean of Guid. | No change |
| Willow Glen | Verdis Crockett (minority) | Principal | No change |
| | Jim McGuire (minority) | Assist. Prin., Student Activ. | No change |
| | Larry Steele (majority) | Assist. Prin., Discipline | Vacancy |
| | Kay Hinerman (majority) | Assist. Prin., Instruction | No change |
| | Kermit Hartley (majority) | Dean of Guid. | No change |
| Broadway | John Tweten (majority) | Principal | No change |
| | Gloria Cutshall (minority) | Dean of Guid. | Robert Lauderdale (from Burnett) (majority) |
| | None | Assist. Prin., Broadway | Gloria Cutshall (minority) |